# AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR
# A CRIMINAL COMPLAINT AND SEARCH WARRANTS

INTRODUCTION AND AGENT BACKGROUND ................................................................. 2

PURPOSE OF THE AFFIDAVIT ............................................................. 4

PROBABLE CAUSE ............................................................................... 7

   I.    BACKGROUND OF INVESTIGATION INTO BENJAMIN HUNT ......................... 7

  II.   HUNT'S COMMISSION OF THE CHARGED OFFENSES ....................................... 9

     A.   February 2024 Sale of Controlled Substances ................................................. 9

     B.   May 2024 Sale of Controlled Substances .................................................... 12

     C.   June 2024 Sale of Controlled Substances and Machineguns ................................. 14

 III.  HUNT'S COMMISSION OF UNCHARGED TARGET OFFENSES ........................ 19

     A.   June 2023 Distribution of Controlled Substances ....................................... 19

     B.   November 2023 Distribution of Controlled Substances ..................................... 21

     C.   May 2024 Distribution of Controlled Substances ........................................ 22

     D.   June 2024 Distribution of Controlled Substances and a Smoke Bomb ................ 24

     E.   July 2024 Receipt of Ammunition ............................................................. 25

     F.   █████████ From ████████ Telegram Account to ████████ . 26

     G.   August 2024 Sale of Controlled Substances ........................................... 27

     H.   August 2024 Distribution of Controlled Substances ........................................ 29

     I.   August █, 2024 Telegram Account Activity .......................................... 30

 IV.  SEARCH OF TARGET LOCATIONS ....................................................... 32

     A.   Target Location #1: ████████████████████ ... 32

     B.   Target Location #2: ████████████████ ................. 33

     C.   Target Location #3: Extra Space Storage, ████████████ 38

     D.   Target Location #4: Target Vehicle ..................................................... 39

     E.   Drug and Firearm Traffickers' Use of Residences and Cell Phones .................. 39

     F.   Authority to Use Biometric Features or Facial Recognition ................................. 49

   V.   CONCLUSION ................................................................................ 50

I, Kevin Barbosa, being sworn, state:

## INTRODUCTION AND AGENT BACKGROUND

1.      For the past eleven years, I have been employed as a police officer by the city of New Bedford, Massachusetts.  For the past three years, I have been assigned to the Drug Enforcement Administration ("DEA") as a Task Force Officer ("TFO").  Prior to being assigned as a TFO to the DEA, I was assigned to the New Bedford Police Organized Crime Intelligence Bureau for over six years.

2.      As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of drug, firearms, and money laundering laws listed in the United States Code.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3.      During my career, I have received extensive specialized training in the field of controlled substance identification, investigation, and enforcement.  For example, I participated in a 21-week training with the State Police Municipal Academy.  I have also attended training courses on search and seizure, advanced tactics for patrol, a 20-hour drug investigation course, an 8-hour South Coast Anti-Crime Task Force Drug Enforcement Seminar, an 8-hour course on field testing drugs, and various other formal and informal trainings.

4.      During my career, I have participated in all aspects of criminal investigations, including conducting surveillance and undercover operations, executing searches pursuant to court-ordered search warrants, and executing arrests.  I have written and/or participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled

substances, United States currency, records of narcotics and monetary transactions, drug customer lists, and other documents relating to the manufacturing, transportation, ordering, purchasing, and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds.  I have participated in the interviews of numerous defendants and witnesses regarding large-scale narcotics trafficking.  I have also participated in various wiretap investigations of individuals involved in significant criminal activity.

5.      I have participated in numerous investigations into individuals involved in the possession or distribution of controlled substances.  In addition, I have also participated in numerous investigations into individuals involved in related crimes often committed by drug traffickers, including money laundering and the possession or trafficking of firearms.

6.      Based on my training and experience, I am familiar with various types of controlled substances, the associated paraphernalia, the prices of various substances, and the common terminology used to refer to these substances. I am also familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, transport, and sell narcotics, as well as methods used to collect, expend, account for, transport, and launder drug proceeds.

7.      I am familiar with the facts and circumstances of the investigation described herein based on my personal participation in this investigation since approximately April 2023.  I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources, including information from: federal, state, and local law enforcement partners; physical surveillance; public records; records received in response to subpoenas, evidence obtained from search warrants; and queries of law enforcement records and intelligence databases.

## PURPOSE OF THE AFFIDAVIT

8.      I submit this affidavit in support of an application for a criminal complaint charging

Benjamin Hunt, a/k/a ████████████ a/k/a ████████████ ("HUNT") with (i) three counts

of possession with intent to distribute and distribution of controlled substances, in violation of 21

U.S.C. § 841(a), and (ii) one count of possession and transfer of a machinegun, in violation of 18

U.S.C. § 922(o) (hereinafter, the "Charged Offenses").

9.      In addition to investigating HUNT for the Charged Offenses of (i) 21 U.S.C. § 841

and (ii) 18 U.S.C. § 922(o), law enforcement is also investigating HUNT for (iii) conspiracy to

distribute and to possess with intent to distribute controlled substances, in violation of 21 U.S.C.

§ 846, (iv) dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A), and (v)

money laundering, in violation of 18 U.S.C. § 1956 (together with the Charged Offenses, the

"Target Offenses").

10.     I also submit this affidavit in support of applications for warrants to search the

following locations for evidence, fruits, and instrumentalities of the Target Offenses:

a.      ████████████████████████████ (more fully
described in Attachment A-1) ("Target Location #1");

b.      ████████████████████████ (more fully described in
Attachment A-2) ("Target Location #2");

c.      Extra Space Storage, ████████████████████████
(more fully described in Attachment A-3) ("Target Location #3");

d.      A ██████████ Ford ████████████████████████ (more fully
described in Attachment A-4) (the "Target Vehicle") (collectively, the "Target
Locations").

11.     As summarized below, an ongoing investigation has revealed that HUNT is the suspected operator of an online marketplace on the application Telegram[1] that sells and offers for sale countless types of controlled substances, firearms, and other contraband that HUNT and others working with HUNT then ship via the U.S. mail.  During this investigation, law enforcement has seized multiple packages shipped by HUNT or others working with him, and these packages have contained controlled substances, firearms, and other contraband.  Law enforcement has also used an undercover officer ("UC") to pose as a customer on HUNT's online marketplace(s) and placed various orders from HUNT, where HUNT offered to sell drugs, firearms, and firearm parts in exchange for cryptocurrency payments.  The seizures resulting from HUNT selling controlled substances and machinegun conversion devices via the U.S. mail are the basis for the Charged Offenses of (i) possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841, and (ii) possession and transfer of a machinegun, in violation of 18 U.S.C. § 922(o).  These seizures and other evidence summarized below are also the basis for the continuing investigation into the additional Target Offenses of (iii) conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846, (iv) engaging in the business of dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A), and (v) money laundering, in violation of 18 U.S.C. § 1956.

---

[1]     Telegram is a cloud-based instant messaging application. According to Telegram's website, Telegram is a messaging application that allows users to send messages, photos, videos, and files of any type, as well as create groups for up to 200,000 people or channels for broadcasting to unlimited audiences.  Telegram also offers end-to-end encrypted voice and video calls, as well as voice chats in groups for thousands of participants.  Telegram also has a "secret chat" function with self-destructing messages, photos, and videos.

12.     HUNT currently resides at Target Location #1 and has access to that location.  As summarized below, there is probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses will be found at HUNT's current residence, which is the basis for the search of Target Location #1.

13.     HUNT resided at Target Location #2 from at least April 2023 to approximately September 2023.  HUNT's mother, "K.H.", now resides at Target Location #2, but HUNT appears to retain access to Target Location #2 and continues to receive certain packages at that location.  As summarized below, there is probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses will be found at this address associated with HUNT, which is the basis for the search of Target Location #2.

14.     HUNT currently rents a storage unit at Target Location #3 and has access to that location.  As summarized below, there is probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses will be found at the storage unit being used by HUNT, which is the basis for the search of Target Location #3.

15.     HUNT has been observed using the Target Vehicle to travel to or from Target Location #1, Target Location #2, and/or Target Location #3 since at least August 2023 and as recently as August 22, 2024.  HUNT has transported packages within the Target Vehicle to post offices on multiple occasions, as outlined herein.  These packages have subsequently been found to contain controlled substances, firearms, and firearms parts.

16.     I submit this affidavit for the limited purpose of establishing probable cause for the requested criminal complaint against HUNT and the requested warrants to search the Target Locations.  Accordingly, I have not included every fact known to me and/or other law enforcement officers involved in this investigation.

**PROBABLE CAUSE**

I.     **BACKGROUND OF INVESTIGATION INTO BENJAMIN HUNT**

17.     Since at least April 2023, members of the DEA, the United States Postal Inspection Service ("USPIS"), the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), the ███ ████████████████████████████████████████████████████████████████ , and other law enforcement partners have been investigating HUNT for committing various federal crimes.  This investigation focused on HUNT selling or making available for sale various types of controlled substances (including fentanyl, cocaine, ketamine, oxycodone, and MDMA), firearms, firearm parts, machineguns, and smoke grenades.

18.     In or around March 2023, investigators identified HUNT as the suspected operator of a Telegram account[2] with username ████████ and display name ████████████ The DEA Syracuse office initially identified HUNT through an analysis of CashApp payments to a target of their investigation who was suspected of operating a Telegram channel[3] that was advertising narcotics for sale.  Specifically, law enforcement identified CashApp payments to a target being made by someone with a display name of ████████ Username ████████ had previously been observed in their target's Telegram channel (consistent with the ██████ username on the CashApp

---

[2]     Telegram is a cloud-based social media platform and messaging service.  Telegram allows users to exchange messages, share media and files, create groups, and hold private and group voice or video calls.  Telegram can be used on smartphones, tablets, and computers, and it is available for use on Android, iOS, Windows, macOS, Linux, and web browsers.

[3]     According to Telegram's website, Telegram channels are a tool for broadcasting public messages to large audiences.  They offer an opportunity to reach people directly, sending a notification to their phones with each post.  Telegram channels have an unlimited number of subscribers and only administrators have the right to post.

payments).  Records obtained from CashApp for the account associated with the display name

███████ identified the verified user as HUNT with Target Location #2 listed as HUNT's address.

19.    HUNT's use or control of the ███████ account has been confirmed with

additional evidence obtained during this investigation.  For example, as summarized below, on

June 26, 2024, after investigators placed an order on one of the Telegram channels operated by

███████, investigators observed HUNT personally delivering a package to the ████

█████ Post Office that contained the items that had been ordered from ███████.

20.    ███████ operated a number of channels on Telegram, which required users of

the Telegram application to subscribe in order to access the channels.  These Telegram channels

marketed controlled substances (including oxycodone pills, ketamine, cocaine, and MDMA), as

well as firearms and firearms parts (including machinegun converters) for sale.  Subscribers of the

Telegram channels were directed to contact ███████ for inquiries about purchases of any of

the items advertised. ███████████████████████████████████████

████████████████████████████████████████████████

███████ The display name for this account is ███████████ Subscribers of the Telegram

channels are now directed to contact ███████████ for inquiries about purchases of any of the

items advertised, as outlined in more detail below.

21.    During this investigation, agents determined that HUNT uses a third-party

postage provider[4] to pay for and print U.S. Postal Service ("USPS") shipping labels for the

packages containing the items that HUNT sells via his Telegram channels.  HUNT or others who

---

[4]    Third-party postage providers allow users to purchase electronic postage using a third-party
company other than the USPS.  "Stamps.com" is a well-known third-party postage provider and
the postage provider believed to be used by HUNT.

are part of his drug trafficking organization ("DTO") then drop the packages into mail collection boxes at different post offices.  Based on my training and experience, I am aware that people involved in shipping drugs or other contraband through the U.S. mail will often use third-party postage because it can be purchased anonymously without going into a post office and risking that illegal activities will be detected by others.

## II.    HUNT'S COMMISSION OF THE CHARGED OFFENSES

22.    As stated above, law enforcement identified HUNT as the suspected operator of the Telegram handle ██████████, and this handle was then identified as operating multiple channels on Telegram where ████████ was offering items for sale.  During this investigation, law enforcement initially identified two Telegram channels operated by ████████: one named ██████████████████ and the other named ████████████████  In or around ████ 2024, law enforcement identified a third channel operated by ████████ named ██████████████████

23.    On three occasions between January and June 2024, an investigator acting in an undercover ("UC") capacity communicated with ██████████ on the Telegram application and arranged to make purchases of controlled substances, firearms, and other contraband.  Each of these three undercover purchases involved HUNT a/k/a ████████ distributing controlled substances, and these three sales are the basis of the violations of 21 U.S.C. § 841 (possession with intent to distribute and distribution of controlled substances) charged in the Complaint.  As part of the third purchase, HUNT also sold a firearm and firearm parts, including two machinegun conversion devices.  That sale is the basis of the violation of 18 U.S.C. § 922(o) (possession and transfer of machinegun) charged in the Complaint.

### A.  February 2024 Sale of Controlled Substances

24.    Between approximately January ██ 2024 and February ██ 2024, the UC communicated with ██████████ on the Telegram application through the ██████████

███████    channel.  During this time, ████████ had various types of controlled substances

and other contraband available for sale on this channel.

25.    On or about February █, 2024, the UC placed an order with ████████ for one

hundred "blues"—blue pills imprinted with "M" and "30," which are the markings on real 30-

milligram oxycodone pills.  Based on my training and experience, M30 oxycodone pills sold in

non-pharmaceutical settings are often counterfeit or fake pills that are comprised of illegal drugs.

Fake pills are especially dangerous because they look like real pharmaceutical pills, but the

consumers generally do not know the type, quantity, or potency of the illicit drugs contained within

the pills.  Fake pills are a significant cause of the ongoing opioid epidemic and fentanyl is the

synthetic opioid that is most often found in fake pills.  *See* "Fake Pills Fact Sheet," DEA, available

at  https://www.dea.gov/sites/default/files/2022-12/DEA-OPCK_FactSheet_December_2022.pdf

(highlighting, in particular, blue M30 pills laced with fentanyl).

26.    Through his communications with ████████, the UC learned that ████████

was selling drugs in exchange for payment via Bitcoin.[5]  As payment for the 100 "blues," the UC

transferred ██████ of Bitcoin to a digital wallet ending in ██████ which was provided to the UC by

---

[5]    Bitcoin is a type of digital currency or cryptocurrency, which operates independently of a
central bank, and which uses blockchain technology to support peer-to-peer transactions between
users on a decentralized network.

[6]    A digital or online "wallet" allows users to access or exchange cryptocurrencies like
Bitcoin.  Unlike a traditional wallet that stores cash, a crypto wallet does not technically store
cryptocurrencies like Bitcoin—the cryptocurrency remains on the blockchain.  However, using
private keys—passwords that give access to the digital wallets—users can send and receive
cryptocurrencies like Bitcoin.  Wallets are long, unique, multi-decimal addresses.  In this case, the
wallet address provided by ████████ was over █ characters long.  I am aware of the full wallet
address but am not including it in full for security reasons.

███████. In return, the UC provided ██████████ with a physical address within the ████████ ███████████ to mail the pills.

27.    On or about February ██, 2024, the package shipped in connection with this purchase was intercepted by USPIS.[7]  Upon opening the package, law enforcement recovered approximately one hundred blue circular pills imprinted with "M" and "30," consistent with the markings for pharmaceutical oxycodone pills.  Included below is a picture of the seized pills:



28.    The seized pills were provided to the DEA laboratory for chemical analysis.  The analysis showed that the seized pills had a net weight of approximately 10.36 grams and tests on a sampling of the pills confirmed the presence of fentanyl.

---

[7]    The sender and return address listed on this package was ████████████" from an address on ██████████████ in ████████████████. Investigators queried this name and address through a law enforcement database and were unable to identify a ████████████ at the listed address. USPS records indicated that this package was shipped from ███████  I believe that HUNT worked with another unidentified individual to fulfill this order.

29.     Accordingly, there is probable cause to believe that on or about February ██ 2024, HUNT distributed and possessed with intent to distribute a controlled substance, to wit fentanyl, in violation of 18 U.S.C. § 841.

**B.  May 2024 Sale of Controlled Substances**

30.     Between approximately March ██, 2024 and May ██, 2024, the UC again communicated with ██████ on the Telegram application through the ████████ ██████ channel.  During these discussions, the UC placed an order with ██████ for 500 "blues," which were, again, pills that appeared to look like pharmaceutical M30 oxycodone pills.

31.     On or about April █, 2024, the UC transferred ██████ of Bitcoin to the wallet provided by ██████, which was the same wallet provided in connection with the February 2024 purchase.  The UC again provided ██████ with a physical location in the ██████ ██████ to mail the purchased pills.

32.     On or about May █, 2024, a package was received at the mailbox provided by the UC to ██████.  Upon opening the package, law enforcement found approximately 520 blue circular pills imprinted with "M" and "30," consistent with the prior pills received from ██████ and consistent with the order that the UC had recently placed with ██████.[8] Included below are pictures of the seized pills:

_____

[8] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████





33.    The seized pills were provided to the DEA forensic laboratory for chemical analysis. The analysis showed that the seized pills had a net weight of approximately 55.5 grams and tests on a sampling of the pills confirmed the presence of fentanyl.

34.    Accordingly, there is probable cause to believe that on or about May 24, 2024, HUNT distributed and possessed with intent to distribute a controlled substance, to wit fentanyl, in violation of 18 U.S.C. § 841.

### C.  June 2024 Sale of Controlled Substances and Machineguns

35.    In or around May 2024, law enforcement identified the ████████████ channel operated by ████████, which had advertised on ████████' other channel, ████████  The ████████████ channel appeared to have been created on or about ██ 2024.    In addition to the controlled purchases that investigators had previously seen ████████ advertise on the ████████████ channel, ████████ also advertised firearms and firearm parts.  A query of ATF databases confirmed that HUNT is not a licensed firearm distributor.

36.    Among other items of concern on the ████████████ channel, investigators observed videos of a 3D printer that appeared to be building firearm parts.  The channel contained a menu where ████████ provided the prices for what appeared to be privately made firearms and firearms parts.  Based on my training and experience, and information provided to me by the ATF, I know that it is common to manufacture privately made firearms ("PMFs") via 3D Printing and other manufacturing techniques. 3D Printers are commercially available and affordable. 3D printers commonly use resin or filament. Files containing codes or programming are widely available on the internet and, when these codes are inputted into 3D printers, they can produce firearm frames, machineguns, and other firearm parts and accessories.  PMFs are typically not serialized and therefore cannot be traced back to their original purchaser.  Additionally, there is no background check required to purchase the unregulated parts of the firearm.

37.    At various times between approximately June █, 2024 and June █, 2024, the UC communicated with ████████ via direct message on the Telegram application.   These communications included discussions about purchasing a Glock 19, which was advertised on the

███████████████ channel, as well as discussions about machine gun conversion devices, referred to as "switches."[9]

38.    On or about June ██, 2024, the UC confirmed the purchase of a fully assembled Glock 19, two "switches" (machinegun conversion devices), and one hundred "blues" (M-30 oxycodone pills like the ones previously purchased from ██████████████).

39.    To receive payment for the sale of the firearm, machinegun conversion devices, and pills, ██████████ provided the address of the wallet ending in ████ which was the same wallet that received payments for the pills sold by ██████████ in February and May 2024, as outlined above.  Later on June ██, 2024, law enforcement sent ██████████ in bitcoin to the wallet provided by ██████████.

40.    On or about June ██, 2024, the UC sent a direct message on the Telegram application to ██████████ and inquired about the status of the purchase made on June ██, 2024. ██████████ confirmed that the payment sent on June ██, 2024 had been received. ██████████ requested an address for the shipment of the items.  The UC provided ██████████ with the physical address of a mailbox located in the ██████████████, and again confirmed that the order was for a Glock 19, two "switches," and one hundred "blues." ██████████ confirmed that the order would be shipped later that day.

---

[9]    Based on my training and experience, and information provided to me by the ATF, I am aware of a firearm part known as a machinegun conversion device, which converts certain firearms from semi-automatic to fully automatic weapons, thus rendering the firearms capable of firing multiple shots by a single function of the trigger.  These parts are commonly also known as "switches" or "Glock chips."  As these parts are intended to convert or "switch" a firearm into a fully automatic machinegun, a machinegun conversion device itself qualifies as a "machinegun" under 18 U.S.C. § 922(o).  Specifically, machinegun conversion devices meet the federal definition of "machinegun" because they are parts "designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun."

41.     At approximately 3:04 p.m. on June 26, 2024, law enforcement conducting surveillance at Target Location #1 observed HUNT exit the building holding what appeared to be a large white box.  HUNT entered the Target Vehicle and ultimately drove to the ████████ Post Office, located at ████████████████████████, Massachusetts.  At approximately 3:46 p.m., HUNT was observed parking the Target Vehicle at the post office, retrieving the box, and entering the post office.  Approximately a minute later, HUNT was observed exiting the post office with nothing in his hands.

42.     Immediately after HUNT entered the Target Vehicle and departed the parking lot, law enforcement entered the post office and observed three parcels on the front counter.  Each of the three parcels had the same listed sender and return address: ████████████████████ ████████████████ .[10] One of the parcels was addressed to the mailbox provided by the UC to HUNT in connection with the purchase of drugs, firearm, and machinegun parts outlined above.

43.     Law enforcement opened the package addressed to the mailbox provided by the UC and controlled by law enforcement.  Upon opening this package, law enforcement recovered two 3D brass knuckles, one black bag containing approximately 110 blue pills imprinted with "M" and "30," another black bag containing two machinegun conversion devices, a Glock-type privately made firearm without a serial number, and an extended magazine with five rounds of 9-millimeter ammunition. ████████████████████████

---

[10]     Investigators queried the listed name and return address through a law enforcement database and determined that the address corresponded with a single-family home.  No person named ████████████ was associated with the address.

████████████████████████████. Included below are pictures of some of the

seized items:





44.    The pills sold by HUNT and seized on June 26, 2024 were provided to the DEA laboratory for chemical analysis.  The analysis showed that the seized pills had a net weight of approximately 10.9 grams and tests on a sampling of the pills confirmed the presence of fentanyl.

45.    Accordingly, there is probable cause to believe that on or about June 26, 2024, HUNT distributed and possessed with intent to distribute a controlled substance, to wit fentanyl, in violation of 18 U.S.C. § 841.

46.    The two machinegun conversion devices sold by HUNT and seized on June 26, 2024 were provided to the ATF for analysis.  Under 18 U.S.C. § 922(o), it is unlawful for any person to transfer or to possess a "machinegun" that is not lawfully owned and registered.  18 U.S.C. § 921 states that the term "machinegun" has the meaning given to such term in section 5845(b) of the National Firearms Act.  The National Firearm Act, 26 U.S.C. § 5845(b) defines "machinegun" to mean "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."  ATF investigators reviewed the two machinegun conversion devices and found them to be consistent with "machineguns" for purposes of violations of 18 U.S.C. 922(o) because they are parts designed and intended for use in converting a weapon into a machinegun.

47.    Accordingly, there is probable cause to believe that on or about June 26, 2024, HUNT knowingly possessed and transferred machineguns, in violation of 18 U.S.C. § 922(o).

### III.    HUNT'S COMMISSION OF UNCHARGED TARGET OFFENSES

48.    In addition to the distribution of controlled substances and machineguns that are the basis of the Charged Offenses, the ongoing investigation has also uncovered significant evidence that HUNT is involved in the commission of various other uncharged Target Offenses. Evidence of HUNT's involvement in these other Target Offenses is included below because it (a) provides additional probable cause about the Charged Offenses, and (b) provides probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses, more broadly, may be found at the Target Locations that are the subjects of the requested search warrants.

#### A.    June 2023 Distribution of Controlled Substances

49.    On June ██, 2023, investigators were conducting surveillance at the ██████ Post Office, in ████████ Massachusetts, in connection with this investigation.  At approximately 4:45 p.m., investigators witnessed a ██████████████ ████ park curbside on ████████ ████ across from the ██████ Post Office.  Approximately a minute later, HUNT was observed exiting the driver's seat of the ████████████, retrieving a large gift bag from the rear driver's seat, and entering the ██████ Post Office.

50.    Acting as a customer, an investigator entered the post office and observed HUNT taking USPS envelopes out from the larger gift bag that HUNT was observed entering with and placing the envelopes into a mail slot located on the east wall in the main lobby of the post office. After emptying his large bag and placing the envelopes into the mail drop, HUNT walked over to a shelving unit in the main lobby that contained empty USPS envelopes for the public's use and filled up his gift bag with new postal envelopes.  HUNT then exited the post office, returned to the driver's seat of the ████████████, and departed the area.

51.    Investigators then coordinated with postal employees and reviewed the bin containing the packages that were placed by HUNT in the mail slot located on the east wall.

Investigators located eleven USPS envelopes in that bin mailed to eleven different addresses. All eleven packages had the same return address of ████████████████████████████████ Nine packages were mailed as Priority mail and two packages were mailed as Express mail.

52.     After identifying the mailings HUNT dropped at the ███████ Post Office, a USPIS Postal Inspector arranged for the mailings to be intercepted and removed from the mail stream at the Providence, Rhode Island Processing & Distribution facility during their normal mail flow.  On June ███ 2023, a USPIS Postal Inspector took possession of two of the parcels shipped by HUNT.  On June 15, 2023, the Honorable Patricia A. Sullivan, United States Magistrate Judge, District of Rhode Island, issued warrants authorizing the search of the two parcels.  23-SW-166-PAS (D.R.I.) (under seal) and 23-SW-167-PAS (D.R.I.) (under seal).

53.     From inside one parcel, investigators seized 119 blue circular pills imprinted with "M" and "30," which were concealed within multiple different layers of envelopes.  Based on my training and experience, it is common for narcotics distributors to wrap their narcotics multiple times in an attempt to mask the odor in fear of them being located by law enforcement.  These pills were similar to the counterfeit M30 pills containing fentanyl that were later purchased by the UC from HUNT in 2024.  These pills were provided to the DEA forensic laboratory for chemical analysis.  The analysis showed that the seized pills had a net weight of 13.216 grams and tests on a sampling of the pills confirmed the presence of fentanyl.

54.     From inside the second package, investigators seized a rock-like substance, which was similarly concealed inside multiple different envelopes.  This substance was provided to the DEA forensic laboratory for chemical analysis.  The analysis showed that the substance had a net weight of 1.064 grams and tested positive for MDMA.

B.  **November 2023 Distribution of Controlled Substances**

55.     On November ▮ 2023, a USPS manager who oversees post offices in ▮▮▮,
Massachusetts, provided investigators with information that someone who matched the description
of HUNT visited the post office around 5:05 p.m.[11]  The manager said that this customer dropped
off more than 20 packages, all bearing third-party electronic postage.  These packages were set
aside by the manager.

56.     On the morning of November ▮, 2023, a Postal Inspector traveled to the ▮▮▮
Post Office and picked up the packages set aside by the manager.  There were 24 packages in
total—four of which were selected for further inspection.

57.     On December ▮ 2023, the Honorable Judith G. Dein, United States Magistrate
Judge, District of Massachusetts, issued warrants authorizing the search of the four parcels.  *See*
23-MJ-5616-JGD through 23-MJ-5619-JGD (D. Mass.) (under seal).

58.     Inside the first seized parcel, investigators found approximately 994 blue circular
pills imprinted with "M" and "30," which were concealed in multiple different layers of
envelopes.  The pills were submitted to a DEA forensic laboratory, which confirmed that they
contained fentanyl analogue with a weight of 108.5 grams.  Within the same parcel, law
enforcement recovered approximately 2,000 rectangle shaped off-white pills with the markings
GG249.  These pills were provided to the DEA forensic laboratory for analysis, which confirmed
that the pills were bromazolam with a weight of 616.5 grams.  Investigators also recovered 10

---

[11]     Investigators had previously provided a photograph of HUNT to USPS so that they could
be alerted if HUNT was observed dropping off additional packages.

fifteen millilitre vials containing a liquid.  A DEA forensic laboratory confirmed that the ten glass bottles containing ketamine with a weight of 152.3 grams.[12]

59.     Inside the second seized parcel, investigators found approximately 106 blue circular pills imprinted with "M" and "30," which were concealed in multiple different layers of envelopes.  These pills were submitted to a DEA forensic laboratory, which confirmed that the pills contained fentanyl analogue with a weight of 11.6 grams.

60.     Inside the third seized parcel, investigators found approximately 119 blue circular pills imprinted with "M" and "30," which were concealed in multiple different layers of envelopes.  These pills were provided to the DEA forensic laboratory, which confirmed that they contained fentanyl analogue with a weight of 13.3 grams.

61.     Inside the fourth seized parcel, investigators found approximately 324 blue circular pills imprinted with "M" and "30," which were concealed in multiple different layers of envelopes.  These pills were provided to the DEA forensic laboratory, which confirmed that the pills contained fentanyl analogue with a weight of 36.1 grams.

**C.  May 2024 Distribution of Controlled Substances**

62.     On May 16, 2024, investigators conducted surveillance at ███████████████ in ████████ (Target Location #1).  At approximately 3:52 p.m., investigators observed HUNT exit the side door of this location.  HUNT was carrying a red bag with a white "DoorDash" symbol on the side of the bag.  HUNT entered the Target Vehicle and departed the area.

---

[12]     Fentanyl, fentanyl analogue, and ketamine are all controlled substances.  Bromazolam is not a controlled substance.

63.    At approximately 4:01 p.m., investigators observed HUNT park in the lot of the ████ Post Office at ████████████████. HUNT exited the Target Vehicle carrying two postal boxes/envelopes and entered the post office. Approximately a minute later, investigators observed HUNT exit the post office with no postal boxes/envelopes in his hands, leading investigators to believe that HUNT dropped off the two packages at the post office. HUNT walked directly to his vehicle and departed the area.

64.    Investigators then entered the ████ Post Office and identified the two packages HUNT mailed. The two packages were priority mail packages, one going to ████ and the other going to ████ each with the same return address: ████████████ ████████████████.

65.    A U.S. Postal Inspector arranged for the mailings to be intercepted and removed from the mail stream at the ████████ Processing & Distribution facility during their normal mail flow. Subsequently, investigators applied for a federal search warrant for one of the two packages, which was addressed to a location in ████ On June 10, 2024, the Honorable Patricia A. Sullivan, United States Magistrate Judge, District of Rhode Island, issued a warrant authorizing the search of the package. *See* 24-SW-144-PAS (D.R.I.) (under seal).

66.    Upon execution of the search warrant, investigators recovered approximately 61.4 grams of suspected MDMA, inclusive of packaging, and approximately 65.8 grams of suspected Ketamine, inclusive of packaging, which were concealed in multiple different layers of envelopes. Investigators tested the suspected narcotics utilizing a TruNarc handheld narcotics analyzer and found that one of the items tested positive for ketamine, while the second test was inconclusive. Based on the appearance of the second drug and my training and experience, I believe the second narcotic to be MDMA. Both of these items were provided to the DEA laboratory, and the results

are pending. ███████████████████████████████████

███████████████████████

**D.  June 2024 Distribution of Controlled Substances and a Smoke Bomb**

67.    In addition to the package that was addressed to the UC that was dropped off by HUNT at the ████████████ Post Office on June 26, 2024 (the basis for one of the counts charging distribution of controlled substances and the count charging the transfer of machineguns), investigators located and seized the two additional packages mailed by HUNT on the same date and time at the same post office.  Those two packages also had the same sender information as the package addressed to the UC containing the drugs, firearms, and machineguns mailed on June 26, 2024: ██████████████████████████████

68.    On June 28, 2024, Magistrate Judge Dein issued warrants authorizing the search of these two packages.  *See* 24-MJ-5226 (D. Mass.) (under seal); 24-MJ-5227-JGD (D. Mass.) (under seal).  From inside the first package, investigators seized a smoke grenade, which was concealed in multiple different layers of envelopes.  A picture of the smoke grenade is below:



The smoke grenade was transferred over to the Massachusetts State Police bomb squad. The bomb squad's analysis confirmed the grenade to be a live smoke grenade, containing an explosive fuse and a filler composition to create a colored smoke. These "smoke grenades" burn vigorously and maintain the potential to start a fire under the right conditions throughout the burn duration (typically 25-50 seconds). The smoke emitting from these grenades may also be hazardous and should not be directly inhaled. ████████████████████████████████████

████████████████████

69.    From inside the second package, investigators seized ██ blue circular pills imprinted with "M" and "30," which were concealed in multiple different layers of envelopes. The pills were provided to the DEA forensic laboratory for chemical analysis, which confirmed that the seized pills had a net weight of 4.66 grams and tests on a sampling of the pills confirmed the presence of fentanyl.

### E.  July 2024 Receipt of Ammunition

70.    On July ██, 2024, investigators learned that a parcel was in transit to Target Location #1. Specifically, the parcel was addressed to: ████████████████████████ ████████████ and the sender information was a location in ████████████."[13]

_____



[13] ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

The sender name associated with the package did not correspond to a real person. Investigators queried the return address through a law enforcement database and determined that the address was fictitious.

71.    On July 29, 2024, Magistrate Judge Dein issued a warrant authorizing the search of this package.  *See* 24-MJ-5231-JGD (D. Mass.) (under seal).  Inside this package, investigators found 300 rounds of 9 mm ammunition.

**F.**    ███████████    **From** ███████████ **Telegram Account to** ███████████

72.    As mentioned above, in or around ███ 2024, the ███████ Telegram account was ██████  Law enforcement identified a new Telegram account, ███████████, which I believe HUNT is now operating.[14]  The display name for this account is ███████████ ███████████  currently operates channels ███████████, which remains the same as it was under ███████ ███████████ which appears to be the same as the Telegram Channel ███████████  operated under ███████████ ███████████████████ These Telegram channels market for sale, among other things, various controlled substances, 3D printing services, firearms, and firearms parts.  Subscribers of the Telegram channels are now directed to contact ███████████ for inquiries about purchases of any of the items advertised.

73.    The UC first learned of the new Telegram account because ███████████ posted on the Telegram channel ███████████ and indicated that the ███████ account got ████ and that subscribers should contact ███████████ going forward.

74.    On July 16, 2024, the UC reached out to ███████████ and sent two messages stating, "Yo, this ████ and, ███████████ in an effort to confirm that ███████ was now operating the ███████████. ███████████ confirmed approximately seven minutes later, "Yup."

---

14 ███████████████████████████
███████████████████████████████

75.    On July █, 2024, ████████████ sent the UC a direct message with a link to the ████████████████ Telegram channel and said, ████████████████████████████ ████████████ I believe that in this conversation, HUNT confirmed that he switched his operations over from ██████████████████████████████████████

**G.  <u>August 2024 Sale of Controlled Substances</u>**

76.    Between July and August 2024, an investigator acting in a UC capacity communicated with ████████████ about purchasing "5K blues" referring to 5,000 M-30 counterfeit oxycodone pills, consistent with prior UC purchases. ████████████ confirmed that the price for 5,000 "blues" was $6,500 ("5k blues for 6.5k").  In connection with payment for this purchase, ████████████ provided the same bitcoin wallet address ending in ███ as ████████ provided in connection with the three prior UC purchases outlined above.[15] ████████████ also sent the UC a video of what appeared to be a ██████ ██████████ ██████.  The UC provided the same address for the shipment within the ██████████ ██████.  On August █, 2024, ████████████ provided a tracking number for the shipment.  On Tuesday, August █, 2024, ████████████ confirmed that the package was sent

---

[15] 

out but that the package contained "1.8k blues," and that the rest of the order, which had been for

5,000 pills, would go out Wednesday or Thursday.

77.    On August , 2024, this package arrived at the UC mailbox located in the ███

██████████.  The sender information for this package was: ████████████████

██████████.  Upon opening this package, investigators observed approximately 1600

circular blue with markings "M" and "30," consistent with the prior UC purchases.  The gross

weight of these pills, inclusive of packaging, was approximately 255 grams.  These pills have been

submitted to the DEA laboratory for chemical analysis.  Based on my training and experience and

knowledge of this investigation, I believe that these pills contain fentanyl.  Included below is a

picture of the seized pills:



### H.  **August 2024 Distribution of Controlled Substances**

78.    On August ⬛, 2024, investigators conducted surveillance of HUNT at Target Location #1.  At approximately 11:30 a.m., HUNT exited his residence carrying a backpack and a red bag and entered the Target Vehicle.  Investigators continued surveillance of HUNT as he travelled to Extra Space Storage located at ⬛⬛⬛, where Target Location #3 is located.  There, HUNT was observed entering the building and then exiting and returning with a dolly.  HUNT was then observed taking a blue bag and a red tote out of the trunk of the Target Vehicle and entering the building.

79.    At approximately 11:47 a.m., investigators observed HUNT exit the building and get back into the Target Vehicle.  HUNT departed a short time thereafter.  HUNT then travelled to another address in ⬛⬛⬛.  HUNT was observed entering this address with two blue bags.  HUNT remained at this address for a little over an hour and then was observed exiting the address with at least one bag.  Upon leaving this address, HUNT travelled to the ⬛ ⬛ Post Office.  HUNT was observed by investigators exiting his vehicle carrying at least one package and entering the post office.  Investigators entered the post office as HUNT was leaving and located two packages delivered by HUNT.  The return addresses on both packages was: ⬛⬛⬛ This is the same address used in connection with the fourth UC purchase in August 2024, outlined above.  The packages were seized by law enforcement.

80.    Later that day, on August ⬛ 2024, investigators observed HUNT arrive back at the storage facility at approximately 6:07 p.m.  Investigators observed HUNT exit the Target Vehicle and retrieve a large black tote located inside of his trunk and enter the storage facility.  Investigators went into the storage facility and observed HUNT standing inside of a large storage unit labelled ⬛ (Target Location #3).  Investigators observed three large black totes with red

tops located on the floor or the unit.  Investigators then observed HUNT exit the storage facility carrying an empty blue reusable shopping bag and go to his vehicle.  HUNT was then observed re-entering the storage facility with a large item.  HUNT was subsequently observed departing the area in the Target Vehicle.

81.    On August 26, 2024, the Honorable M. Page Kelley, Magistrate Judge for the District of Massachusetts, issued warrants authorizing the search of the two packages.  *See* 24-MJ-6641-MPK and 24-MJ-6642-MPK (D. Mass.) (under seal).  From inside the first package, law enforcement seized what, based on my training and experience, appears to be approximately one gram of a substance believed to be cocaine.  From inside the second package, law enforcement seized what based on my training and experience appears to be MDMA or a similar methamphetamine.  Investigators tested the suspected narcotics utilizing a TruNarc handheld narcotics analyzer and found that one of the items tested positive for cocaine, while the second test was inconclusive.  These items have been sent to the DEA laboratory for chemical analysis.

**I.    August ▮, 2024 Telegram Account Activity**

82.    On August ▮, 2024, I reviewed Telegram Channel ▮▮▮▮▮▮▮ and observed the following "price list" for items advertised for sale:

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- ▮▮▮▮▮▮▮▮▮
- ▮▮▮▮▮▮▮▮▮▮▮▮
- ▮▮▮▮▮▮▮▮▮▮▮
- ▮▮▮▮▮▮▮▮▮

The channel further advised, ████████████████████████ Based on my training, experience, and knowledge of this investigation "pistol frames" refers to the frame of a handgun or pistol-style firearm, "AR frames" refers to AR-type pistol or rifle receivers, and "full builds" refers to fully assembled firearms. Based upon the prices, the UC's prior interactions with HUNT, and the name of the Telegram channel, which references "3D," I believe that HUNT is fulfilling these orders through use of a 3D printer.

83.     On August ██, 2024, I also reviewed Telegram Channel ████████████ and observed a "product list; that included the following: ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ Again, subscribers of this page were directed: ████████████████████████

84.     On August ██, 2024, I also observed that, within the Telegram channel ████████ ████, there is a ████████████████████ ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ From my review of the ████████████, I observed photographs including various pills, other suspected controlled substances, including marijuana, and firearm parts. A large number of these photographs either tagged ████████████ or included ████████ ████████████████████. My understanding is that ████████████ will frequently delete the content of this channel, but between August ██, 2024, and August ██, 2024, ████████

████████████ ████ ████████████████████████████████████████████

████████████████████ ████████████ ████████████

85.    Based upon my observations of the ██████████ and the ██████████ product list, as well as the ████████████ included on the ████████ for ████████████, I believe that HUNT continues to operate and fill orders through the Telegram channels outlined herein as recently as August ██, 2024.

## IV.    SEARCH OF TARGET LOCATIONS

86.    Based on information set forth herein, there is probable cause to believe that evidence, fruits, or instrumentalities of one or more of the Target Offenses will be located inside the Target Locations.

### A.  Target Location #1: ████████████████████████████████

87.    ██████████████████████████████████████, is a multi-family apartment complex with three apartments. The numbers ████ are affixed to the front of the building above the door.  Target Location #1 is the ██████████████████████. I believe that there is an internal stairwell(s) to access to the units within the building.  Target Location #1 is further described in Attachment A-1.

88.    Based on a USPS change of address form, HUNT has resided at Target Location #1 since approximately at least September 2023.  HUNT has been observed entering and exiting Target Location #1 on multiple dates, including as recently as August 22, 2024.  Target Location #1 is HUNT's registered address with the Massachusetts Registry of Motor Vehicles.  The Target Vehicle, which HUNT has been observed driving, is also registered to Target Location #1 in HUNT's name.  Additionally, records provided by National Grid indicate that HUNT is listed as the account holder for the utilities at Target Location #1.

89.    As outlined in more detail above, on multiple dates, including May 16, 2024 and June 26, 2024, investigators observed HUNT exit Target Location #1 holding packages that HUNT then brought to post offices located in ██████████████. These packages were

found to contain controlled substances, a firearm, machineguns or switches, and ammunition. Based on my training and experience, drug and firearm traffickers generally retain evidence, fruits, and instrumentalities of their crimes in secure locations that that they can access.  Here, there is specific evidence to show that HUNT has used Target Location #1 in connection with his commission of one or more of the Target Offenses.  Furthermore, there is probable cause to believe that HUNT is operating an online marketplace for contraband on the Telegram application, and as of August ██, 2024, was actively advertising multiple items for sale on multiple Telegram channels, including controlled substances and firearms.  There is probable cause to believe that those items are located at Target Location #1, and that records related to past purchases, including customer lists, tracking numbers, payment information, and packaging materials, among other things, will be located at Target Location #1.

90.     Accordingly, there is probable cause to believe that evidence, fruits, or instrumentalities of the Target Offenses, as further described in attachment B, will be located in Target Location #1, as further described in Attachment A-1.

**B.   Target Location #2:** ██████████████████████

91.     ██████████████████████████████████. The number ██ is affixed to the right of the front door.  There is a detached garage on the property.  Target Location #2 is further described in Attachment A-2.

92.     A change of address for HUNT was filed with the USPS effective September 1, 2023.  The change of address listed HUNT's old address as ████████████████ ████████ (Target Location #2) and new address as ████████████████ ████████ (Target Location #1)   I believe that HUNT's mother, K.H., continues to reside at Target Location #2 based upon surveillance and records reviewed from the RMV, which lists Target Location #2 as K.H.'s address.  Despite his change of address, based on the evidence below,

33

there is reason to believe that HUNT continues to access Target Location #2 as recently as July and August 2024, and Target Location #2 continues to be a location involved with the commission of Target Offenses because a package addressed to Target Location #2 was intercepted by the Department of Homeland Security within the past month, and that package was found to contain 13 suspected machineguns or "switches." Thus, there is probable cause to believe that HUNT used Target Location #2 both historically and recently to help facilitate one or more of the Target Offenses.

93.    Surveillance and other evidence has confirmed that HUNT continues to have access to Target Location #2 even after he changed his address in September 2023. This evidence shows that HUNT does not simply visit Target Location #2 to visit his mother. Instead, there is evidence that HUNT has used and may still be using Target Location #2 to receive packages, including packages that may contain contraband.

94.    For example, on October ▮, 2023, investigators observed HUNT arrive at ▮ ▮ and retrieve a package from the front porch of Target Location #2. Investigators then observed HUNT transport that package back to Target Location #1. There is significant evidence that HUNT was continuing to distribute controlled substances during this time. For example, as summarized above in the discussion of Target Offenses, in November 2023, four packages delivered by HUNT were seized and found to contain significant quantities and multiple types of controlled substances.

95.    On May ▮, 2024, investigators conducted surveillance of HUNT at both Target Location #1 and Target Location #2. Prior to this date, investigators had learned that two USPS parcels addressed to ▮, one in the name of "Benjamin Hunt," and other in the name

of ████████ were enroute to Target Location #2.[16]  Investigators decided to do a controlled delivery of the two USPS parcels to Target Location #2 to see if HUNT would receive the packages at that address.

96.    Just prior to the delivery of the parcels at Target Location #2, investigators observed an older white male exit Target Location #2.[17]  A postal inspector placed the two parcels on the front porch of Target Location #2. Shortly thereafter, investigators observed the older male open the front door of Target Location #2 and take the two packages into Target Location #2.  At approximately 11:53 a.m., investigators witnessed the older male depart the area without any packages or bags.  At approximately 1:51 p.m., investigators observed HUNT pull the Target Vehicle into the driveway of Target Location #2.  At approximately 1:58 p.m., investigators observed HUNT depart the area in the Target Vehicle.  Investigators observed HUNT drive directly back to Target Location #1.  At approximately 2:25 p.m., investigators observed HUNT walk in through the side door of Target Location #1 carrying the two parcels under his left arm that had previously been delivered to Target Location #2.

97.    On June 17, 2024, investigators observed HUNT arrive at Target Location #2 in the Target Vehicle and remain there for approximately fourteen minutes before departing the area and ultimately returning to Target Location #1 after making a number of stops. Later that day, HUNT was observed travelling to a post office in ██████ and exiting the Target Vehicle

---

[16] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████

[17]    I believe that this older white male is in a relationship with HUNT's mother, K.H.

carrying a white postal envelope.  HUNT exited the post office without the envelope and departed the area in the Target Vehicle.

98.     HUNT has continued visiting Target Location #2 in recent months.  On June 28, 2024, Magistrate Judge Dein issued a tracking warrant authorizing the installation and use of a global positioning system ("GPS") device on the Target Vehicle.  *See* 24-MJ-5228-JGD (D. Mass) (under seal).    The device was installed on or about July 8, 2024, and data was received until on or about August 12, 2024.  During that period, the Target Vehicle travelled to Target Location #2 on several occasions, including on July 15, July 21, July 23, July 27, July 28, July 29, August 1, August 5, August 9, and August 11, 2024.

99.     Additionally, during this investigation, information was provided by investigators from the Department of Homeland Security, Homeland Security Investigations ("HSI") that a package sent from China to Target Location #2 was inspected by Customs and Border Patrol ("CBP") upon arrival at John F. Kennedy Airport in New York on July ████ 2024.  The name on the package addressed to Target Location #2 was ████████  which further indicates that HUNT was the intended recipient of this package, given HUNT's ██████████████████.  The phone number associated with the package was ████████.  Law enforcement identified this as a phone number listed for a CashApp account belonging to HUNT, further indicating that HUNT was the intended recipient of this package addressed to ████████ at Target Location #2.

100.     CBP investigators searched this package from China to Target Location #2.  Inside this package, investigators recovered 13 Glock switches or machine gun conversion devices, which appear designed to convert firearms into fully automatic weapons.  As indicated above in the section discussing HUNT's transfer of a machinegun to the UC, this design and intended use likely

qualifies these switches as 13 "machineguns" under the National Firearms Act.  A photograph of these items is included below:



101.    HSI additionally provided information that between January ⬛, 2024 and June ⬛, 2024, ⬛⬛⬛⬛ received three other packages at Target Location #2 that were sent from China.

102.    Given all of the above, I believe that HUNT has used and is continuing to use Target Location #2 to receive packages, including packages containing items such as machine gun conversion devices or switches, which are unlawful to possess or transfer.

103.    Accordingly, there is probable cause to believe that evidence, fruits, or instrumentalities of one or more of the Target Offenses, as further described in attachment B, will be located in Target Location #2, as further described in Attachment A-2.

C.  **Target Location #3: Extra Space Storage,** ████████████████████

104.    Target Location #3 is ████████████ at the Extra Space Storage facility in ███

███, Massachusetts.  Target Location #3 is an approximately 11 x 9 feet storage unit.  Target

Location #3 is more fully described in Attachment A-3.  Target Location #3 is rented under a

fictitious name with the initials "B.H" and a listed address of ███████████, ████████████

Massachusetts (similar to Target Location #2's address, which is ██████████████).  The

information received in connection with the driver's license included with the application for

Target Location #3 is fictitious based upon the license number, which does not correspond with a

Massachusetts RMV license in that name.   Target Location #3 is an approximate two-minute drive

from Target Location #1.

105.    As outlined above, on August 22, 2023, HUNT was observed travelling to Target

Location #3 from Target Location #1, and then ultimately travelling to a post office where he

mailed two packages.  As stated above, a subsequent search of these packages pursuant to federal

warrants revealed that these packages contained substances which, in my training and experience,

appear to be controlled substances to include cocaine and MDMA or a similar methamphetamine.

Thus, there is reason to believe that HUNT stores items associated with his unlawful distribution

of various items at Target Location #3.

106.    Based on my training and experience, those who unlawfully sell drugs and firearms

often use storage units to stash away their drugs, drug paraphernalia, drug proceeds, firearms, and

related items.

107.    The data shows that between July 8, 2024, and August 12, 2024, HUNT visited

Target Location #3 on several occasions, including on July 24, July 25, July 29, July 30, August

1, August 2, August 3, August 7, and August 9, 2024.

108.    Accordingly, there is probable cause to believe that evidence, fruits, or instrumentalities of one or more of the Target Offenses, as further described in attachment B, will be located in Target Location #3, as further described in Attachment A-3.

**D.  Target Location #4: Target Vehicle**

109.    Target Location #4 is the Target Vehicle, which is a vehicle registered to HUNT that is often observed parked in the parking lot associated with Target Location #1.  As outlined herein, HUNT has been observed on a number of occasions using the Target Vehicle to travel between Target Location #1, Target Location #2, and Target Location #3, and has transported multiple packages to post offices in the Target Vehicle that have subsequently been found to contain controlled substances, firearm parts, and firearms.

110.    Accordingly, there is probable cause to believe that evidence, fruits, or instrumentalities of the Target Offenses, as described in Attachment B, will be located in Target Location #4, as further described in Attachment A-4.

**E.  Drug and Firearm Traffickers' Use of Residences and Cell Phones**

111.    Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances and firearms frequently maintain quantities of illicit drugs to maintain their ongoing drug business.  I also know that narcotics traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils at their residences or stash locations.  I also know that traffickers of firearms usually keep, in addition to firearms, ammunition, firearm parts, and related items at their residences or stash locations.  Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store

drug a paraphernalia for longer periods of time than they keep drugs.  Similarly, I am aware that it is generally a common practice for firearms traffickers, especially those that utilize a 3D printer, to keep the materials needed to manufacture the firearms and firearms parts longer than they keep the firearms and firearm parts that they offer for sale.

112.      Based on my training and experience, I am aware that drug traffickers will frequently store drugs, drug paraphernalia, drug proceeds, and documents relating to their drug trafficking at more than one location. This practice is designed to avoid law enforcement seizure and/or theft of large quantities of drugs or drug proceeds.  It also allows drug traffickers to distance themselves from some or all of the evidence of their drug trafficking in the event of their apprehension by law enforcement or seizure of the drugs or drug proceeds by law enforcement. This is true for firearms traffickers as well.  In this investigation, I believe that HUNT uses Target Locations #1, #2, and #3 to either receive or store his narcotics and firearms paraphernalia and that he transports these items between these locations using the Target Vehicle.

113.      Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers

and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities for an extended period of time, regardless of whether they are physically in possession of drugs on the premises. Similarly, firearms traffickers keep records of payments made or owed, as well as contact information for both clients and suppliers in order to efficiently conduct their firearm trafficking business.

114.    Even when drug or firearm traffickers store contraband outside of their residence, I know that they will often keep records relating to these offsite storage locations at their primary residence, here, Target Location #1. Such documents include rental or storage property agreements and receipts.

115.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences, large sums of money, either proceeds from drug or firearm sales or monies to be used to purchase controlled substances or firearm or firearm production materials.

116.    Many experienced drug and firearm traffickers will often engage in money laundering to conceal the source of their drug and firearm proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug and firearm traffickers will combine cash from their drug trafficking and firearm trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug and firearm trafficking would also typically be maintained in residences.

117.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers and firearm traffickers generally try to hide cash and sensitive documents related to their drug and firearm trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

118.    Many drug dealers receive their drugs through overnight parcels and keep mailing labels both used and unused for future use.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Bitcoin, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such individuals will often maintain records of these transactions in case there is a later dispute concerning what funds were transmitted and when.  Here, HUNT uses USPS to send packages to his Telegram customers and therefore there is probable cause to believe that records related to these shipments as well will likely be located at the Target Locations.

119.    Additionally, in this investigation, HUNT has provided a Bitcoin wallet address to receive money from the UC in connection with the four purchases outlined above.   I know from my training and experience and that of other law enforcement agents that I have worked with that wallets are essentially digital accounts.   A cryptocurrency user can store and access wallet software in a variety of forms, including via:

- a PC or laptop ("desktop wallet"),
- a mobile application on a smartphone or tablet ("mobile wallet"),
- an Internet-based cloud storage provider ("online wallet"),
- an online account associated with a cryptocurrency exchange ("online account"),
- a tangible, external device, such as a USB thumb drive ("hardware wallet"), or
- printed public and private keys ("paper wallet").

Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (*e.g.*, smart phones or tablets) or at websites that users can access via a computer,

smart phone, or any device that can search the Internet. Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency. In addition, paper wallets contain an address and a QR code with the public and private key embedded in the code. Paper wallet keys are not stored digitally. There is probable cause to believe that evidence related to HUNT's Bitcoin wallet and its manner of storage will be located at the Target Locations.

120.    During the searches of residences, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the residences. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership—even if they are in the name of a proxy—and they can be helpful when attempting to flee police.

121.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that 3D printers and their programming, which I expect to find in the Target Locations, are often controlled by peripheral

devices which can be digital media, hard drives, personal computers, tablets, cellular phones, or other computer devices. I also know that the manufacturing process requires tools and accessories like curing stations, pliers, and cutting tools.  These types of items are more likely to remain in a residence used for 3D printer production, or a stash location, for longer periods of time than the product that the 3D printer is programmed to make—here firearms and firearm parts.

122.    Based on training and experience, I know that most drug dealers and firearms traffickers regularly use cellular telephones to communicate about their drug trafficking and firearm trafficking activities with customers, suppliers, and other co-conspirators.  I also am aware that drug traffickers and firearm trafficking are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.  Because cellular telephones are often a principal means of communication, drug dealers and firearm traffickers typically keep the phones in close proximity. Additionally, in my experience, many drug dealers and firearms traffickers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in residences or stash houses.  As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug or firearm traffickers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from residences used by drug and firearm traffickers.

123.    Based on my training and experience executing search warrants at the residences of drug and firearms traffickers, in a substantial number of residential searches executed in connection with similar investigations, investigators have recovered:

a.  Controlled substances and materials used to "cut" or dilute those substances.

b.  Firearms, firearm parts, and ammunition.

c.  Weapons or explosive devices other than firearms.

d.  Tools used to make privately made firearms or machinegun conversion devices, including 3D printers and documents or plans relating to the 3D printers.

e.  Cash, currency, and records relating to the sale of controlled substances or firearms, including records of financial transactions relating to obtaining, transferring, laundering, concealing, or expending things of value derived from the sale of controlled substances or firearms.

f.  Books, records, receipts, notes, ledgers, and other papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to co-conspirators, suppliers, or customers, or relating to the purchase, storage, use, or distribution of controlled substances or firearms.

g.  Postage materials, labels, and receipts reflecting the shipping of controlled substances or firearms.

h.  Documents or tangible evidence reflecting dominion, ownership, and/or control over the property to be seized, and over online accounts, bank accounts, safe deposit boxes, financial and/or monetary assets, real property, motor vehicles, or storage facilities that contained or constituted evidence, fruits, or instrumentalities of the crimes under investigations.

i.  Cellular phones and computers that contained evidence of the crimes under investigation, such as but not limited to, records, receipts, notes, ledgers, and other evidence reflecting names, addresses, telephone numbers, and other contact or identification data relating to co-conspirators, suppliers, or customers, or relating to the purchase, storage, use, or distribution of controlled substances or firearms.

124.  Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include but are not limited

to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have the capabilities described above.

125.    Seizure of devices containing this information will provide information relating to co-conspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs and firearms typically use cellular telephones to communicate with their suppliers, their customers, and with other co-conspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs and firearms regularly keep records of their illegal activities. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking and firearm trafficking activities often take photographs of their closest confederates. Records of drug trafficking and firearm trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

126.    Additionally, I know that many drug traffickers and firearm traffickers often use cellular telephones to communicate quickly and economically with their suppliers and customers via the internet.  This is particularly relevant in this case where there is probable cause to believe that HUNT is operating an online marketplace on Telegram for the sale of controlled substances, firearms, and firearm parts, among other things, and that HUNT is fulfilling orders placed through his various Telegram channels.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug and firearm traffickers meet with co-conspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug and firearm traffickers store drugs, maintain bank accounts, and conceal their drug and firearm proceeds.

127.    Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

a.    Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.    Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

c.    Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

128.    Law enforcement agents will endeavor to search and seize only the phones which, upon reasonable inspection and/or investigation conducted during the execution of the search, appear to contain the evidence in Attachment B.  If, however, the law enforcement agents cannot determine the use or ownership of any particular device while at a Target Location, agents will seize and search that device off-site and at a subsequent time, pursuant to the probable cause established herein.

129.    Based on the foregoing, there is probable cause to believe that evidence of the commission of the Target Offenses, more specifically, the items set forth in Attachment B, will be found in the Target Locations, as described in Attachments A-1, A-2, A-3, and A-4.

F.  **Authority to Use Biometric Features or Facial Recognition**

130.    I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition.

131.    On Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

132.    The make or model of devices used by HUNT or any other phones found at the Target Locations are unknown.  However, there is probable cause to believe that HUNT is operating the application Telegram on an electronic device.  The passcode that would unlock any phones that may be found at the Target Premises or that are being used by HUNT are also unknown.  Thus, it may be useful to press the fingers (including thumbs) of HUNT to a seized device's fingerprint sensor or to hold the device up to the face of HUNT in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  The government

may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

133.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of HUNT to the sensor of any seized devices or place the devices in front of HUNT's face for the purpose of attempting to unlock the devices.  This warrant does not seek authority to use biometric features or facial recognition of others, such as HUNT's mother.

## V.    <u>CONCLUSION</u>

134.    Based on the evidence set forth above, as well as my training and experience, I submit that there is probable cause to charge HUNT in a Criminal Complaint with (i) three counts of possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841, and (ii) one count of possession and transfer of machineguns, in violation of 18 U.S.C. § 922(o).

135.    Further, I believe that evidence, fruits, and instrumentalities of the Target Offenses (which include but are not limited to the Charged Offenses), as more fully described in Attachment B, will be found in the Target Locations, as more fully described in Attachments A-1, A-2, A-3, and A-4.  Accordingly, I respectfully request that a Criminal Complaint be issued for HUNT and search warrants be issued for the Target Locations.

I, Kevin Barbosa, hereby state under penalty of perjury that the contents of this affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

/s/ Kevin Barbosa

_____

Task Force Officer Kevin Barbosa
DEA

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 on August 27, 2024.

_____
Honorable M. Page Kelley
United States Magistrate Judge
District of Massachusetts